UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SUSAN LEO,

                    Plaintiff,           **1:18-cv-00214-MAT**
          -vs-                            **DECISION AND ORDER**

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
_____

## I. Introduction

Susan Leo ("Plaintiff"), represented by counsel, brings this action under Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner" or "Defendant"), denying her application for Disability Insurance Benefits ("DIB"). The Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Plaintiff's motion is granted, and Defendant's motion is denied. The Commissioner's decision is reversed, and the matter is remanded for the calculation and payment and benefits.

## II. Procedural History

Plaintiff protectively filed for Title II benefits on February 27, 2017, alleging an onset date of February 14, 2000. The claim was initially denied on April 26, 2017. Plaintiff requested a hearing, which was conducted by administrative law judge Lynette

Gohr ("the ALJ") on September 20, 2017, in Buffalo, New York. Plaintiff appeared with counsel and testified. Dawn Blythe, a vocational expert ("the VE"), also testified.

The ALJ issued an unfavorable decision, *see* T.9-18,[1] on October 24, 2017, noting that there was a prior closed period of disability with a decision date of November 18, 2006. Applying the principle of *res judicata*, the ALJ determined that Plaintiff's alleged onset date could not be adjudicated until November 18, 2006. Therefore, the ALJ ruled from November 19, 2006, through the date last insured of December 31, 2009. However, the ALJ excluded the time between January 2008, and September 2008, because she found at step one of the five-step sequential evaluation that Plaintiff engaged in substantial gainful activity by working full-time as a substitute English teacher during that 9-month period. At step two, the ALJ determined that Plaintiff's ulcerative colitis and status post-proctocolectomy with ileal pouch anastomosis and loop ileostomy and closure were "severe" impairments.[2] At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal a listed impairment, including Listing 5.06

---

[1]
Citations to "T." refer to pages in the certified administrative transcript (Docket No. 6).

[2]
The ALJ also considered other medical issues alleged by Plaintiff or referenced in the record, including post-traumatic stress disorder, rheumatoid arthritis, right ankle surgery in 1999 with related deep vein thrombosis, back pain, and chest pain. T.12-13. However, these impairments were found non-severe, a finding which Plaintiff does not challenge in this appeal.

(Ulcerative Colitis). The ALJ then assessed Plaintiff as having the residual functional capacity ("RFC") to perform a range of sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she was limited to performing simple, routine tasks and making simple work-related decisions; she needed minimal changes in work routines and processes; and she could not be subjected to strict production quotas. T.13. The ALJ also found that Plaintiff must be allowed 3 bathroom breaks of 5 minutes' duration each per day, in addition to normal breaks and mealtimes, and that her workstation must be located in close proximity to a bathroom, defined as no greater than three minutes' walking distance. *Id.* Lastly, the ALJ found that Plaintiff must be allowed to stand for five minutes, while remaining on task, after having sat for 45 minutes. *Id.* At step four, the ALJ determined that Plaintiff was 47 years-old at her date last insured, had a master's degree in education, and while she previously worked as an office manager and as a long-term substitute teacher, she did not have any past relevant work. The ALJ relied on the VE's testimony to find that, based on Plaintiff's age, education, work experience, and RFC, she is able to perform the requirements of the following representative occupations that exist in significant numbers in the national economy: call out operator, charge account clerk, and document preparer. At step five, the ALJ entered a finding a "not disabled."

Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on December 11, 2017. Plaintiff then timely commenced this action.

## III. Scope of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. *See* 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quotation omitted). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

## IV. Discussion

### A.    Summary of the Parties' Arguments

Plaintiff contends that reversal of the Commissioner's decision is required on the following grounds: (1) the highly specific limitation in the RFC regarding bathroom breaks is unsupported by substantial evidence, as is the sit/stand option (Point I); (2) the ALJ failed to properly evaluate the retrospective medical opinion offered by Plaintiff's treating physician insofar as she weighed the opinion against the RFC rather than the record as a whole (Point II.A); and (3) the ALJ substituted her lay opinion for that of the treating physician (Point II.B). The Commissioner responds that the RFC is supported by ample evidence and that the treating source's opinion is merely a summary of the medical records with a bare conclusion of disability, and thus was not entitled to be afforded any significant weight.

### B.    Points I and II.A: Errors in Weighing the Treating Source Opinion and Formulating Limitations in the RFC Regarding Plaintiff's Need to Use the Bathroom and Alternate Between Sitting and Standing

#### 1.    Relevant Medical Records and Plaintiff's Testimony

Plaintiff served as a flight medic in the United States Marine Corps during the Desert Storm conflict and was deployed for fourteen months throughout the Middle East. T.439. She did not engage in combat but witnessed it; she subsequently was diagnosed

with post-traumatic stress disorder. *Id.* While she was deployed, Plaintiff developed ulcerative colitis. T.242. On July 3, 2001, Dr. Victor Fazio at the Cleveland Clinic Digestive Disease and Surgery Institute ("Cleveland Clinic") performed a two-stage J-pouch surgery to address Plaintiff's left-sided refractory colitis. T.242; 275-77.

On September 12, 2003, the Veteran's Administration ("VA") issued a decision finding Plaintiff 100 percent disabled based on her service-connected condition of ulcerative colitis with history of amnestic disorder. T.136.

In February 2006, Plaintiff was having twelve to fifteen bowel movements a day, with nighttime leakage for which she wore adult diapers. T.250. She had been told she had kidney stones related to her diarrhea. *Id.* Dr. Fazio, who had performed her surgery in July 2001, diagnosed her with irritable pouch syndrome versus bacterial overgrowth. T.251.

A pouch biopsy performed on September 29, 2008, showed mild chronic active enteritis; and squamous mucosa and rectal mucosa with chronic active colitis, ulcer, and granulation tissues. T.270. Gastroenterologist Dr. James Church of the Cleveland Clinic noted that Plaintiff was having five to six bowel movements per day and "constant" diarrhea. T.292.

On July 17, 2010, Plaintiff saw Dr. Matthew Carrell of the VA and reported having eight to ten watery bowel movements daily and

nighttime rectal leakage after being told to stop taking ciprofloxacin, an antibiotic. T.711. Dr. Carrell noted that Plaintiff had symptoms that suggested pouchitis.[3] He deferred prescribing ciprofloxacin due to the risks of long-term antibiotic usage and because she was to undergo a flexible sigmoidoscopy later that week. T.712-13.

At the hearing, Plaintiff testified that she had worked for a period of time in the 2007-2008 school year as a substitute English teacher. T.32. She was offered another teaching position in September 2008, but did not take it due to symptoms from her ulcerative colitis and kidney stones. T.33. While she was working, she had to take frequent breaks to go to the bathroom, so the school accommodated her by providing her with a teaching assistant. T.33. In addition to experiencing abdominal cramping, bloating, and diarrhea, T.34, she was "was experiencing dehydration because [she] was trying not to eat during the classroom hours so that [she] can make it through without going to the bathroom too much." *Id.* Plaintiff explained that following one meal, she might have to go to the bathroom four times. *Id.* While she was teaching, she had to take eight to ten bathroom breaks during the school day. *Id.*

---

[3] "Pouchitis. Acute inflammation of the mucosa of an ileal reservoir or pouch that has been surgically created, usually following total colectomy for inflammatory bowel disease or multiple polyposis." Stedman's Medical Dictionary ("Stedman's"), 28th ed., Lippincott, Williams & Wilkins, 2006, p. 1550.

As far as daily activities, "showering was always a problem" and "dressing was too" as she needed help from her husband to put her support stockings on. T. 37. Plaintiff could not do laundry because it was too heavy, but she could fold clothes. T.39. Plaintiff's husband would sometimes take her out to eat, but they had to be careful and go places close to home. *Id.* If she had active symptoms, she did not go to the movies. T.40. After 2008, Plaintiff reported, her condition worsened. T.36. During this period, she was treating at the VA, the Cleveland Clinic, and with Dr. Raymond Tuoti. T.36. From 2008 to 2009, Plaintiff had "a lot" of active periods of colitis. T.40. The types of food she ate and her stress levels affected her colitis. T.41. She explained that "[s]ometimes it comes out of nowhere." *Id.* She "just didn't want to leave the house because of it[.]" *Id.* When her colitis was active, Plaintiff experienced chronic fatigue symptoms. T.44.

Plaintiff testified that when needed to use the bathroom, she had to do so urgently. T.54. If she felt the urge to use the bathroom, she would be unable to wait even ten minutes. T.54. Plaintiff (and those around her) could actually hear her J-pouch empty; "[she] could hear it before it gets ready to just release." T.55. At that point she would "quickly run to the bathroom." *Id.* To try to control her need to defecate she would stop eating and drinking. T.54. For instance, because she knew she had her hearing at 11:00 a.m., she stopped eating the day before at 5:00. *Id.* At

other times, she wore diapers. *Id.* Fasting and restricting her fluid intake, in order to limit her trips to the bathroom, resulted in her becoming dehydrated and suffering from kidney stones. T.35.

## 2. Treating Physician Opinion

In September 2017, Dr. Church provided a retrospective medical statement based on his treatment of Plaintiff and his review of her medical records. *See* T.1339-41. Dr. Church noted that even after Plaintiff's July 2001 J-pouch surgery to address her ulcerative colitis which had failed medical treatment, she continued to have "quite extreme frequency of defecation" along with abdominal cramps and bloating. T.1339. Dr. Church observed that "[a]ll of these [symptoms] are part of the spectrum of pouch-related complications although [Plaintiff's] were more severe than average." T.1339. At her follow-up, Dr. Church noted that, "[e]ndoscopically, the pouch looked normal[,] but the different physiology that pouch surgery can produce is sometimes accompanied by these sort of symptoms without there being any notable disease to be diagnosed." T.1340. A possible cause was that "the small intestine is just unsuited for uses of fecal reservoir because it doesn't normally provide this function." *Id.* Dr. Church related that when he saw Plaintiff in September 2008, she had "diarrhea constantly and had developed an anal skin tag[,]" *id.*, even though her pouch and terminal ilium looked healthy and a biopsy showed some mild chronic active enteritis. Dr. Church told her that "this was the way her pouch was

-9-

functioning" and recommended that she return in two years. *Id.* In 2010, Plaintiff still reported having six bowel movements a day with episodes of bloating, cramps, and diarrhea. In addition, she was having upper quadrant pain. *Id.* The cause for this was unknown but Dr. Church explained that it can occur in situations where the surgery did not lend itself to good intestinal functioning; such patients "are doomed to experience bowel episodes for the rest of their life." T.1341.

In Dr. Church's opinion, it was

> obvious from this brief history of [Plaintiff's] care here at the Cleveland Clinic that she became disabled as a result of surgery for ulcerative colitis. Sometimes even the ulcerative colitis can be disabling because of the urgency and the need to drop everything and make it to the bathroom to prevent an episode of incontinence. . . . In addition, [Plaintiff] seems to suffer from a much higher stool frequency than average. There are several possible causes for this, but one would include a bowel that is just more active than normal, a pouch that is smaller or less than compliant than normal, or a pouch that has some issue with bowel patency above or below it.

T.1340.

### 3. The ALJ Failed to Properly Weigh the Treating Source Opinion

It is undisputed that Dr. Church is a treating source, *see* 20 C.F.R. § 404.1527(a)(2) (eff. until Mar. 27, 2017), who provided a medical opinion, *see id.* § 404.1527(a)(1). Since Plaintiff filed her claim in February 2017, the regulations codifying the treating physician presumption of deference were still in effect. *See* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March

27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply."). "Generally, [the SSA] give[s] more weight to medical opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [his or her] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). "If [the SSA] find[s] that a treating source's medical opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the SSA] will give it controlling weight." *Id.*

Here, the ALJ assigned only "some weight" to Dr. Church's medical opinion because it did "not change the above narrative [sic]," T.15 and is "not inconsistent with the above residual functional capacity assessment." *id.* This was clearly erroneous for multiple reasons. First, the regulations dictate that a medical opinion be evaluated using certain factors, including the nature and extent of the treatment relationship, supportability of the opinion, consistency with the record as a whole, and the provider's

specialization. *See* 20 C.F.R. § 404.1527(c)(1)-(6) (eff. until Mar. 27, 2017). Neither a "narrative" constructed by the ALJ nor an RFC assessment are mentioned as proper factors to be considered when evaluating a treating source opinion.

The second, more problematic error, is the boilerplate language utilized by the ALJ to describe Dr. Church's opinion as "not inconsistent with the above residual functional capacity." The Court has found nothing in the regulations or the caselaw supporting the propriety of assigning weight to a medical opinion based upon whether the ALJ deems the opinion to be congruent with the ALJ's own RFC finding. Rather, this type of language has been rejected by this Court and others as confounding the ability for meaningful review and improperly inverting the necessary analytical steps. *See*, *e.g.*, *Faherty v. Astrue*, No. 11-CV-02476(DLI), 2013 WL 1290953, at *14 (E.D.N.Y. Mar. 28, 2013) ("The ALJ explained the reason for giving Dr. Tranese's medical source statement significant weight was that it was consistent with her RFC. Such reasoning is circular and flawed. The ALJ should use medical opinions to determine [p]laintiff's RFC, and, therefore, cannot give medical opinions weight based on their consistency with the RFC.") (internal citation to record omitted); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) ("One problem with the boilerplate is that the assessment of the claimant's 'residual functional capacity' (the bureaucratic term for ability to work)

comes later in the administrative law judge's opinion, not 'above'—above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.")).

The regulations define "[m]edical opinions" as "statements from acceptable medical sources that reflect judgments about[,]" *inter alia*, "what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions[,]" 20 C.F.R. § 404.1527(a), i.e., the claimant's RFC. It is simply not logical to decide a claimant's RFC prior to weighing the medical opinions regarding the "the nature and severity of [her] impairment(s), including [her] symptoms, diagnosis and prognosis," *id. See Burton v. Colvin*, No. 6:12-CV-6347 MAT, 2014 WL 2452952, at *11 (W.D.N.Y. June 2, 2014) ("Because '[t]he assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms[,]' *Otero v. Colvin*, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013), it is not logical to decide a claimant's RFC prior to assessing her credibility.")

(alterations in original). Here, the fact that the ALJ stated that Dr. Church's opinion was only entitled to limited because it "otherwise does not rebut the above residual functional capacity assessment," *id.*, confirms that the ALJ "[got] things backwards[,]" *Bjornson*, 671 F.3d 645.

Evaluating Dr. Church's medical opinion with reference to the proper regulatory factors compels the conclusion that it should have been given controlling weight. The nature and extent of the treatment relationship and the provider's specialization weigh in favor of deferring to Dr. Church's opinion: He had treated Plaintiff for several years and was a colleague of Dr. Fazio, who performed the two-stage J-pouch surgery. In addition, Dr. Church is a specialist in his field of gastroenterology. That Dr. Church's opinion was retrospective and Plaintiff was seen once in 2008 does not, in this Court's view, undermine his opinion or the severity of Plaintiff's limitations due to her impairments. "The absence of contemporaneous medical evidence does not automatically preclude a finding of disability." *Rose v. Barnhart*, No. 01 CIV. 1645 (JSM), 2003 WL 1212866, at *5 (S.D.N.Y. Mar. 14, 2003) (citing *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) ("Arnone's post-1980 evidence is not irrelevant to the question whether he had been continuously disabled since 1977."); other citations omitted)); *see also Rose*, 2003 WL 1212866, at *5 (finding that ALJ erred in "focus[ing] entirely on the absence of contemporaneous medical evidence";

"since there was no contemporaneous treatment record, the ALJ should have considered the possibility of retrospective diagnosis and testing") (citing *Martinez v. Massanari*, No. 01 Civ. 2114, 2003 WL 179771, *4 (S.D.N.Y. Jan. 27, 2003)). Moreover, there is no suggestion in the record that additional visits to the Cleveland Clinic or to other medical providers were required of Plaintiff, or that any further treatment could reasonably have been expected to have improved her symptoms to the point she was able to work. Dr. Church's opinion reflects that Plaintiff apparently was at her "baseline" and that the symptoms she experienced at her baseline were still disabling. T.1340.

It is well settled that "[t]he ALJ is not permitted to substitute [her] own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (citing *Snell v. Apfel*, 177 F.3d 128, 131 (2d Cir. 1999)); *see also Wagner v. Secretary of Health and Human Servs.*, 906 F.2d 856, 862 (2d Cir. 1990) ("[A] circumstantial critique by [a] non-physician[ ], however thorough or responsible, must be overwhelmingly compelling" to justify a denial of benefits). Here, the ALJ's critique of Dr. Church's opinion was not "thorough," insofar as it neglected to consider the appropriate regulatory factors. Moreover, it is not "overwhelmingly compelling" when considered against Dr. Church's specialization and expertise and the record as a whole. In short,

the Court finds that the ALJ "here improperly 'set [her] own expertise against that of' the treating physician." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quotation omitted; alteration in origina).

### 4. The Limitation in the RFC Assessment Regarding Bathroom Breaks

The key component of the ALJ's RFC assessment challenged by Plaintiff pertains to the frequency of her need to take bathroom breaks due to bowel movements and the unpredictable timing and urgency of those episodes. The ALJ concluded that it was "clear" that Plaintiff's ulcerative colitis "was better managed during the period at issue with the claimant complaining of only 5-6 daytime bowel movements." T.15, 292. To quantify Plaintiff's need to use the restroom during the workday for purposes of formulating the RFC, the ALJ reasoned that

> [i]f waking hours of a day are 16 and of that, 8 are working, then the claimant could be expected to have 3 bowel movements per workday. In Dr. Church's letter, he notes 15 daytime bowel movements well before the period at issue and only 6 per day shortly after the date last insured (Ex. 6F). At the February 2008 follow-up visit-that is, during the period at issue, the claimant reported 5-6 bowel movements per day (Ex. 2F/9). The evidence therefore supports that the claimant was having at most 6 daytime bowel movements during the period at issue which would likely mean 3 per workday. Such a need is accommodated for in the above residual functional capacity assessment.

T.15. The ALJ then accounted for Plaintiff's condition by finding her limited to a range of work in which she would be allowed to take three bathroom breaks of five minutes' duration each, per day,

in addition to normal breaks and mealtimes, and in which she would be located in close proximity to a bathroom, defined as no greater than three minutes' walking distance. T.13.

Plaintiff contends that the ALJ improperly "craft[ed] a mathematical algorithm" which was inconsistent with the evidence regarding the frequency and urgency of her bowel movements, while the Commissioner defends the ALJ's RFC as the product of "simple arithmetic" based "directly on the number of bowel movements Plaintiff herself reported at her periodic follow-up visit with Dr. Church in September 2008—the only evidence of record documenting Plaintiff's ulcerative colitis symptoms during the relevant period." Defendant's Memorandum of Law ("Def.'s Mem.") at 14. However, Dr. Church's retrospective opinion and the treatment notes for the relevant period, illustrate that Plaintiff's bowel movements consisted of diarrhea. *See* T.1340, 292. When he saw Plaintiff in follow up, Dr. Church noted that she was "constantly" having diarrhea during this time. *See id.*

Thus, even if, assuming a best case scenario, Plaintiff had only five bowel movements a day, they consisted of diarrhea. *See* Plaintiff's Reply ("Pl.'s Reply") at 4. Diarrhea "*denotes not merely abnormal looseness of stools but also an increase in the urgency and frequency of defecation*" and is defined as "[a]n abnormally frequent discharge of semi-solid or fluid fecal matter from the bowel." Stedman's, p. 534 (italics in original). Thus,

they were inherently urgent, frequent, and unpredictable, and the record does not contain substantial evidence supporting that they could be accommodated in three bathroom breaks or by waiting for a scheduled break or mealtime. To the contrary, Plaintiff testified that she could have four bowel movements after just one meal. As an example, if she ate breakfast in the morning, Plaintiff potentially could use up the three "extra" bathroom breaks in the RFC shortly thereafter. At that point, there was "no guarantee" that she could wait until her next scheduled break time to get to a bathroom. *See* Plaintiff's Memorandum of Law ("Pl.'s Mem.") (Docket No. 9-1) at 11. As Dr. Church explained in his opinion, having ulcerative colitis with a J-pouch meant Plaintiff had the "need to drop everything and make it to the bathroom" as soon as she felt the urge to have a bowel movement. And, as Plaintiff points out, the "three minutes' distance" limitation would not necessarily accommodate her situation because of other variables, such as the lavatory being occupied by another employee when Plaintiff needed to use it.

The only way Plaintiff could control her bowel movements was to refrain from drinking water or eating food. *See* T.34, 54. When she denied herself necessary hydration for extended periods of time—as she did when she was substitute teaching—she, not surprisingly, became dehydrated. T.34. This practice also resulted in her suffering from kidney stones. T.35. Notably, Plaintiff had

a teaching assistant to accommodate the problems she was having as far as needing to go to the bathroom and take frequent breaks. T.33. On average, she was taking eight to ten bathroom breaks during the school day. T.34.

In order to make it through important events, Plaintiff would fast the night before. T.54. For instance, prior to her disability hearing, Plaintiff fasted for eighteen hours. *Id.*

The record compellingly demonstrates that Plaintiff's ulcerative colitis and status post two-stage J-pouch surgery result in not only a frequent need to use the bathroom, but also an unpredictability and urgency in that need. For instance, Dr. Church's opinion describes the primary, and often "disabling," symptom of ulcerative colitis as "the urgency and the need to drop everything and make it to the bathroom to prevent an episode of incontinence." T.1340. In addition, Dr. Church observed, Plaintiff "seems to suffer from a much higher stool frequency than average." *Id.* The Court agrees with Plaintiff that there is a dearth of evidence to support the ALJ's structured bathroom-break limitation in the RFC.

### 4. The Sit/Stand Option in the RFC

Plaintiff also challenges the sit/stand option contained in the RFC, which allowed her to alternate from sitting for 45 minutes to standing for five minutes. The Commissioner defends this limitation as giving Plaintiff "the benefit of the doubt." Even

assuming this limitation was made in deference to Plaintiff, it still needed to be based on substantial evidence. *See Wheeler v. Berryhill*, No. 3:16-CV-01916, 2018 WL 1528763, at *9 (M.D. Pa. Mar. 8, 2018) (finding "additional limitations" imposed "in deference to the claimant" not based on substantial evidence where ALJ "in essence rejected many of Dr. Falvello's opinions and having implicitly rejected much of Dr. Gryczko's RFC assessment" and "appear[ed]" to have "based much of her RFC assessment on her own lay analysis of [the claimant]'s medical records, which is not permitted") (citation omitted), *report and recommendation adopted*, No. 3:16-CV-1916, 2018 WL 1518572 (M.D. Pa. Mar. 28, 2018). The Court is unable to find substantial evidence in the record for this limitation. When Plaintiff's ulcerative colitis symptoms were active, she suffers from "rectal pressure," she "feel[s] like [she] ha[s] a UTI," she has "to go to the bathroom all the time," she "get[s] seepage, abdominal bloating, cramping," and she "break[s] out in rashes, hives. . . ." T.48. She has had hives since being diagnosed with ulcerative colitis and amebiasis due to being infected with the parasite entamoeba histolytica during Desert Storm. *Id.* When asked if the hives had an "impact on . . . fidgeting around as far as sitting," Plaintiff responded affirmatively, explaining that it was "because [she] feel[s] the pressure" and it was "better for [her] standing." *Id.* She testified "it's better to lay down sideways," and at home, she "always ha[s]

to be laying down." T.50. She will "stand up sometimes, . . . sit a little bit and then [she] need[s] to lay down" "because of the way the pouch is." *Id.*

While "[s]edentary work is the least rigorous of the five categories of work recognized by SSA regulations," *Schaal v. Apfel*, 134 F.3d 496, 501 n. 6 (2d Cir. 1998), "[b]y its very nature 'sedentary' work requires a person to sit for long periods of time even though standing and walking are occasionally required," *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) (citation omitted). The record lacks substantial evidence to support the proposition that Plaintiff can sit for the "long periods of time" required in a sedentary occupation. Based on Plaintiff's testimony, there is no suggestion that she could sit for six hours out of an eight-hour day, or even sit for 45 minutes at a time per the sit/stand option in the RFC. *See*, *e.g.*, *Rice v. Colvin*, No. 1:15-CV-00959 (MAT), 2016 WL 7366977, at *2 (W.D.N.Y. Dec. 20, 2016) ("The ALJ's decision does not explain what evidence supports this particular sit/stand option, and the Court can find no support for such a specific restriction in the record. The ALJ's decision thus once again fails to 'provide appropriate rationale with specific references to evidence of record in support of the assessed limitations.'") (quoting *Cruz v. Astrue*, 941 F. Supp.2d 483, 487 (S.D.N.Y. 2013); further citations omitted).

**B.    Point II.B: Substitution of Lay Opinion for Competent Medical Opinion**

Plaintiff argues that the RFC assessment was not supported by substantial evidence because the ALJ assigned the only medical opinion in the record "some weight" and effectively rejected it. Plaintiff contends that this created a clear evidentiary gap. Pl.'s Mem. at 18 (citing *Stein v. Colvin*, No. 15-CV-6753-FPG, 2016 WL 7334760, at *4 (W.D.N.Y. Dec. 19, 2016) ("Regardless of whether it was proper for the ALJ to discount this opinion, the ALJ's rejection of the only medical opinion in the record created an evidentiary gap in the record requiring remand.") (collecting cases)). Where, as here, "the record is bereft of any medical assessment of residual functional capacity," courts have "found a lack of substantial evidence to support a finding that exertional [or non-exertional] impairments are not disabling, since the ALJ is not qualified to assess residual functional capacity on the basis of bare medical findings." *Rodriguez v. Sec'y of Health & Human Servs.*, 893 F.2d 401, 403 (1st Cir. 1989) (collecting cases). "Given Plaintiff's multiple physical . . . impairments, this is not a case where the medical evidence shows 'relatively little physical impairment' such that the ALJ 'can render a common sense judgment about functional capacity.'" *Palascak v. Colvin*, No. 1:11-CV-0592(MAT), 2014 WL 1920510, at *9 (W.D.N.Y. May 14, 2014) (quoting *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)); *see also*, *e.g.*, *Stein*, 2016 WL 7334760, at

*4 ("[T]he ALJ could not 'render a common sense judgment' as to Stein's functional capacity without a medical opinion, because Stein has several complicated and longstanding mental impairments including bipolar, anxiety, and depressive disorders, and ADD.") (citations omitted). "[B]ecause there is no medical source opinion to support the ALJ's residual functional capacity finding, the Court concludes that it lacks substantial evidentiary support." *Palascak*, 2014 WL 1920510, at *10 (citing *House v. Astrue*, No. 5:11-CV-915 (GLS), 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013); other citation omitted)).

### C. Remedy

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405(g)). The standard for directing a remand for calculation of benefits is met when the record persuasively demonstrates the claimant's disability, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980), and where there is no reason to conclude that the additional evidence might support the Commissioner's claim that the claimant is not disabled, *Butts*, 388 F.3d at 385-86.

After reviewing the entire record, the Court finds that it already has been developed fully for the relevant period. Furthermore, as discussed above, the Court finds that the record

contains persuasive proof of Plaintiff's disability. Applying the correct legal standards to all of the relevant evidence, including Dr. Church's retrospective opinion, the Court concludes that Plaintiff's ulcerative colitis and J-pouch surgery; the sequelae of her medical condition; and the ramifications of the surgery she underwent to address it, are fully disabling. Accordingly, the Court finds that a remand for further administrative proceedings to correct the above-discussed errors would serve no purpose, and remand for the calculation of benefits is warranted.

## V. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted to the extent that the Commissioner's decision is reversed, and the matter is remanded solely for calculation and payment of benefits for the closed period at issue. The Commissioner's motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

S/Michael A. Telesca
_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     September 19, 2019
           Rochester, New York